UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

DEMETRIUS K. THOMAS                     CIVIL ACTION NO. 11-cv-2119

VERSUS                                   JUDGE HICKS

WARDEN, LOUISIANA STATE                  MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

**Introduction**

Shelby Smith was found dead with multiple gunshot wounds to the head.  An investigation led to Demetrius Thomas ("Petitioner"), who admitted shooting Smith but claimed he did so in self-defense.  Petitioner waived a jury, and Caddo District Judge John Mosely, Jr. found him guilty of second-degree murder.  The conviction and mandatory life sentence were affirmed on direct appeal.  State v. Thomas, 981 So.2d 850 (La. App. 2d Circ. 2008), writ denied, 999 So.2d 769 (La. 2009).  Petitioner also pursued a post-conviction application in the state courts.  He now seeks federal habeas corpus relief.  For the reasons that follow, it is recommended the petition be denied.

**Sufficiency of the Evidence**

### A.  The Trial Evidence

Shreveport city workers were mowing grass along a street when the mower pulled a burlap cover aside and revealed the body of Shelby Smith.  Shreveport police officer Amy Muller went to the scene and saw that the victim had what appeared to be four gunshot

wounds to the right side of his head, plus two gunshot wounds on the lower left side of the head, and a long graze-type wound on the top of the left shoulder.  Among the items found with the body were pine straw, shattered automotive glass, and a cell phone.  Police used the phone to help identify the body.

The victim's family said he had last been seen alive at a Circle K store near the intersection of Linwood and West 70th Street in Shreveport.  Surveillance video from the store showed the victim with a group of men that included Petitioner, who at first was identified only as "Little D."  After publication of the photos of "Little D," police were told that Petitioner was the person called Little D.  Petitioner spoke with police and admitted he was at the Circle K with the victim that night, but he said the victim had dropped him off at his home, and he had not seen the victim since.

Police later visited Petitioner's residence, where his girlfriend allowed them inside. The officers detected an odor of blood in a back storage room.  They secured the scene and obtained a search warrant.  A search revealed numerous bloodstains in the storage room and a good deal of what appeared to be shattered auto safety glass scattered outside.  Police found bloodstains that began in the driveway and carport area and lead behind the house and into the storage room.  They found fairly large piles of raked pine straw out front, similar to the pine straw found with the body.  Office Muller said the storage room smelled like a decomposing body and some sort of pine-scented cleaner.  A resident of the house later called police and reported finding a bloodstained T-shirt and a portion of a Texas auto title

with the victim's name on it.  The title was found inside a magazine in the living room of the house.

Police questioned Petitioner again.  He was advised of his <u>Miranda</u> rights and, after initially asking for an attorney, decided to speak with the officers.  In the tape recorded interview (Tr. 1647-72), Petitioner first asked what evidence the police had against him, and the police were quite forthright in describing what they had learned.  Petitioner said that he met the victim three or four weeks earlier and had been hanging out and drinking with him. They had discussed the victim selling Petitioner his truck, which is described throughout the record as a distinctive truck with a custom paint job, wheels, and other accessories. Petitioner said he would buy the truck for $4,000.  When the victim drove Petitioner home, they began discussing the sale in the driveway while sitting in the cab of the truck.  Petitioner claimed the victim said he really needed the money because he had "done got into some shit." (Petitioner later said the victim wanted to sell his truck so he could buy an Avalanche.) The victim soon afterward reached in his driver's side door panel and pulled out a pistol. Petitioner told the police that the victim pointed the pistol at him and pulled the trigger, but there apparently was not a round in the chamber.  Petitioner said he grabbed the pistol and began struggling with the victim as he also tried to talk him out of what he was attempting. Petitioner said the victim's hand must have "pushed the thing back and it put one in the chamber and my finger was on the trigger."  Petitioner said the gun "just went off," and the light trigger resulted in the pistol continuing to fire.

Petitioner told police that he was scared because he was on parole.  Rather than report the incident to a police officer who lived next door, he pulled the truck into his driveway and, after a great deal of struggle, dragged the body to the storage room.  He eventually threw the gun over the I-220 bridge, and he drove the truck to a secluded area near Blanchard where he set it on fire.  He took the body to the area where it was recovered.  Petitioner said he used pine straw in an effort to soak up blood.  Petitioner said he had no idea what kind of gun was used, and he threw away all the shell casings.  Petitioner led police to the area where the victim's truck was found.

Petitioner testified at trial and offered similar testimony.  He said he had earned the $4,000 from hustling, gambling, and doing music, but it was gone by the time he was arrested because he had spent most of it on his children or for household items.  He said he had actually placed the $4,000 in the victim's pocket, but he took it back after he shot him.  Petitioner testified that he did not have a gun and that the weapon involved belonged to the victim.  Sam Smith, the victim's cousin, testified at trial that he had been at the Circle K that evening and that Petitioner had a handgun (unspecified) that he was showing the other men.

### B.  Petitioner's Burden

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979).   "[I]t is the

responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).  Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard.  It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard.  Parker v. Matthews,132 S.Ct. 2148, 2152 (2012).

**C.  Analysis**

Petitioner was charged with second-degree murder, which is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily injury.  La. R.S. 14:30.1.  When self-defense is raised as an issue, the State has the burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense.  Louisiana law in effect at the time provided that self-defense was justification for killing only if the person committing the homicide reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that deadly force was necessary to save his life.  State v. Thomas, 981 So.2d at 854, citing La. R.S. 14:20.

The trial judge who heard the evidence found Petitioner guilty. He noted that there was evidence that persons at the Circle K were uncomfortable with Petitioner, who was armed and acting strangely. Petitioner later shot the victim several times, including at least four shots to the head, which indicated to the court specific intent. He also noted that Petitioner took steps to hide the evidence of the crime rather than report it to a neighboring police officer, which deprived him of credibility. He found no evidence of self-defense other than the self-serving and not credible statements by Petitioner. Tr. 963-64. The state appellate court reviewed the evidence in detail, set forth the applicable Jackson standard, and determined that the trial court reasonably exercised its discretion to reject Petitioner's tale and find that he did not act in self-defense when he shot the victim multiple times in the head. State v. Thomas, 981 So.2d at 852-55.

Petitioner argues that Sam Smith was not credible because he gave a statement to police that described Petitioner's weapon as a western-style revolver, and evidence later indicated that the victim was killed by a nine millimeter bullet that likely was not fired from the revolver. The weapon/bullet issue will be discussed more later, but it suffices for this issue to state that Smith did not testify at trial about the kind of gun possessed by Petitioner, and habeas relief on a sufficiency of the evidence claim is allowed only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 99 S.Ct. at 2791-92. This review must, therefore, be confined to the trial record and not statements witnesses gave police or other evidence that was not admitted at trial. Petitioner also argues that there was no scientific

proof that the blood found at his house was actually blood or belonged to the victim, there was no forensic evidence regarding the path of the bullets that entered the victim, and the like.

Petitioner's arguments are the kind that might sway a judge or jury tasked with deciding his guilt in the first instance. Judge Mosely had that role, and he rendered a verdict of guilty based on Petitioner's admission that he shot the victim multiple times and spilled his blood all over his yard and home. The judge also found incredible Petitioner's claim that he did so in self-defense. The appellate court assessed that verdict under the deferential Jackson standard and found that there was ample basis in the record to support it. The undersigned finds that the appellate court's decision was a quite reasonable application of Jackson to the facts of this case. Petitioner's testimony, the physical evidence, and the attempted coverup were not logically consistent with a self-defense scenario. Habeas relief is not allowed on this claim.

**Illegal Search and Arrest**

Petitioner filed a pro se motion to suppress in the trial court and challenged the search of his residence. Tr. 857. He continued to pursue the issue in a pro se assignment of error on direct appeal. The appellate court addressed the merits of the motion to suppress, even though it appeared the trial court never ruled on it.

The record showed that police entered Petitioner's residence with the consent of his girlfriend, Ms. Barnes, who lived in the residence with Petitioner. Petitioner argued that the search was illegal because another person was the actual lessee of the premises and that his

girlfriend did not have authority to give police consent to enter.  The appellate court found the argument to be "substantively without merit."  The girlfriend consented to allow officers to enter and, upon seeing and smelling blood in the area, the officers also obtained a search warrant.

The entry with consent was permissible if authorized by a person with "common authority" over the premises, which is based on mutual use of the property by persons generally having joint access or control for most purposes.  State v. Thomas, 981 So.2d at 856, citing U.S. v. Matlock, 94 S.Ct. 988 (1974).  A warrantless search is valid even if consent was given by one without authority, if the facts available to officers at the time of entry justified their reasonable belief that the person consenting to the search had authority over the premises.  Thomas, citing Illinois v. Rodriguez, 110 S.Ct. 2793 (1990).  The information available to police indicated that the girlfriend lived in the residence and had consent to authorize their entrance.  The person whose name was on the actual lease was unimportant given the reasonable appearance the girlfriend had common authority over the residence where she lived.

Petitioner raised another Fourth Amendment issue in his post-conviction application. He claimed that police arrested him without an arrest warrant at the time they conducted the search.  Tr. 1187.  The text of his argument also complained that there was no probable cause for arrest.  Tr. 1201-11.  The trial court focused on the issue as listed and denied relief because a warrant is not necessary to make an arrest.  Tr. 1305.  The appellate court found Petitioner's application insufficient to determine the relevant events surrounding his arrest.

Additional briefing and materials were ordered.  Tr. 1307-08.  The court then found the claim meritless because probable cause for arrest did exist at the time Petitioner was taken from his home.  Tr. 1440.  The Supreme Court of Louisiana denied writs without comment.  Tr. 1646.

With respect to the claim of illegal arrest, the Supreme Court stated in Gerstein v. Pugh, 95 S.Ct. 854 (1975) that there is an "established rule that illegal arrest or detention does not void a subsequent conviction."  See also Montoya v. Scott, 65 F.3d 405, 421 (5th Cir. 1995).  With respect to the consent to search, the state court quite reasonably determined that the information available to the officers indicated that the girlfriend who lived in the residence had authority to allow their entrance.  Petitioner's later arguments based on alleged legal technicalities as to who was a party to the lease, Section 8 housing rules, and the like are insufficient to undermine that decision.

The merit of these claims is discussed here primarily because of their relevance to a Strickland claim that will be addressed below, but the Fourth Amendment claims as such are barred from habeas review by the doctrine of Stone v. Powell, 96 S.Ct. 3037 (1976).  In Stone, the Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  96 S.Ct. at 3037.  The doctrine also applies to claims of unlawful arrest.  See Lucas v. Johnson, 132 F.3d 1069, 1083 (5th Cir. 1998) (claim of lack of probable cause to support arrest did not state a habeas claim; barred by Stone).  To satisfy the "opportunity for full and fair litigation" requirement, the state need only provide the

processes whereby a defendant can obtain full and fair litigation of a Fourth Amendment claim.  Stone bars federal habeas consideration of that claim whether or not the defendant employs those available processes.  Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002).

Louisiana law provides a procedural mechanism to litigate Fourth Amendment claims. Petitioner was provided an opportunity to employ that mechanism, he exercised that opportunity, and his claims were denied on the merits.  Stone therefore bars habeas relief on the illegal search and arrest claims.

**Voluntariness of Statement**

**A. Introduction**

Petitioner argued in a pro se brief on direct appeal that the statement he gave police was not voluntary because he was coerced through "psychological influence."  He argued that he initially declined to speak, but officers turned off the tape recorder and promised he could see his children if he would give a statement.  Tr. 1018, 1028-29.  He presented the argument again in his writ application to the Supreme Court of Louisiana.  He again argued that officers coerced him into speaking by promising that he could visit his children.  Tr. 1061, 1080-84.  Petitioner presses these coercion arguments in his federal petition, but he also adds new and different claims that must first be addressed.

**B. New and Unexhausted Claims**

Petitioner's federal petition presents new and different claims, including contentions that (1) questioning should have stopped after he invoked his right to counsel and (2) police deleted a portion of the tape.  Petitioner represents that the deleted recording would show that

both detectives said they believed Petitioner's self-defense claim because the victim looked as though he had been fighting.

Neither of these arguments were presented to the state courts, so they are barred from consideration for lack of exhaustion of state court remedies.  Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir.1997) ("The exhaustion requirement is not satisfied if the prisoner presents new legal theories or factual claims in his federal habeas petition").  If Petitioner attempted to present the claims to a state court today, they would be untimely, so they are deemed to be technically exhausted and subject to a procedural bar.  Jones v. Jones, 163 F.3d 285, 296 (5th Cir. 1998).  Federal habeas relief may be granted on a procedurally defaulted claim only if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law.  Id. at 296.  The "cause" standard requires the petitioner to show that some objective factor external to the defense impeded his efforts to raise the claim in state court.  Murray v. Carrier, 106 S.Ct. 2639 (1986).  As for the second factor, a "showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied 'fundamental fairness' at trial."  Murray, 106 S.Ct. at 2648.

Petitioner's new arguments are ones that would have been well known to him from the beginning.  There was no later discovery of the relevant facts, and neither the government nor any other external factor prevented Petitioner from presenting the claims to the state courts during his multiple opportunities to do so.  Petitioner cannot demonstrate cause, so there is no basis to overcome the procedural default that accompanies the lack of exhaustion.

### C. The Coercion Claims

A confession must be voluntary to be admissible, and a judge must make a determination of voluntariness before the confession is admitted to the jury.  Jackson v. Denno, 84 S.Ct. 1774 (1964).  A finding of a valid Miranda waiver is usually tantamount to a conclusion that the resulting confession was also voluntary.  Missouri v. Siebert, 124 S.Ct. 2601, 2608 (2004).

The transcript of the recorded statement shows that the officers presented Petitioner with a Miranda rights card and told him he was under arrest for first degree murder. Detective Tom Oster read the card with Petitioner, who initially stated that he needed to call an attorney.  The detective finished going over the Miranda rights and, based on the request to call an attorney, ended the interview and recording.

The recording began again one minute later.  Detective Oster stated that Petitioner decided he did not want an attorney present during the interview and wished to give his version of what happened.  Petitioner stated that this was correct.  The detective then asked if he or Detective Smith had done anything to make Petitioner change his mind, and Petitioner said, "I did it voluntarily."  Tr. 1647-50.

At the end of the interview, Detective Oster asked if he or Detective Smith or any other member of the police department had coerced or threatened or promised Petitioner anything for him to talk to them.  Petitioner responded, "No, sir.  Y'all promised me that I could see my children.  Y'all will go get my children and I can hold my kids."  Oster agreed that they would but added, "Yeah, but we didn't say that had anything to do with you talking

to us, did it?  We just told you that earlier that we'd bring your kids to see you, right?  After we got done with our business here today?"  After some discussion, Petitioner agreed, "Y'all never said y'all wouldn't get them if I didn't talk."  Tr. 1670.  Oster also asked, "When we turned the tape off, it was your decision then at that point that you decided you wanted to talk to us, correct?"  Petitioner answered yes and agreed that he was not threatened or coerced in any way to talk.  Tr. 1671.

Detective Oster testified at trial about administering the <u>Miranda</u> warnings and the voluntariness of Petitioner's statement.  Defense counsel asked how the issue of visiting children came up.  Oster said Petitioner was upset and was saying some things about never being able to see his children again.  Oster said he could not remember whether Petitioner was allowed to visit them afterward.  Tr. 922-25.  Petitioner testified at trial that he had two children, ages four and five, and that he did get to visit his daughter at the police station the night he gave his statement.  Tr. 938-39.  The trial judge found that the statement was "freely and voluntarily made" and was admissible.  Tr. 933.

Petitioner argued on direct appeal that his statement was coerced by the promise that he could visit his children in exchange for a self-defense statement.  The appellate court considered the evidence discussed above and the district court's ruling.  It found nothing to undermine the trial judge's finding, which was "essentially a credibility determination." <u>State v. Thomas</u>, 981 So.2d at 857.

This claim was adjudicated on the merits in the state courts, so habeas relief is available only if that decision was (1) contrary to or involved an unreasonable application

of clearly established federal law as determined by the Supreme Court or (2) based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  State court findings of fact are presumed to be correct unless the petitioner rebuts that presumption by clear and convincing evidence.  Section 2254(e)(1).

The finding in this case that the statement was made voluntarily is fully supported by the record.  Petitioner has not pointed to any persuasive evidence that would require the finding be overturned.  The record does show that there was a discussion about Petitioner visiting his children, but the record does not support the contention that the visit was allowed based on the condition that Petitioner confess his involvement in the crime.  Reasonable minds might quibble with the precise interpretation of the evidence, but the conclusion reached by the state court was based on a reasonable assessment of the facts and application of the law.  It  does not allow habeas relief.

**Ineffective Assistance of Counsel**

### A.  Introduction; Petitioner's Burden

Petitioner claims that his trial counsel was ineffective for a number of reasons.  The court, earlier in the proceedings, pointed out that some of the claims of ineffective assistance were not exhausted in the state courts.  Petitioner responded by voluntarily dismissing those unexhausted claims.  Docs. 21 and 22.  The remaining claims will be addressed on the merits.

Petitioner faces a heavy burden to obtain habeas relief on an ineffective assistance claim.  He first must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable

probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

Petitioner's claims were adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold.  Schriro v. Landrigan, 127 S.Ct. 1933, 1939 ( 2007).  The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential."  Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be."  Harrington v. Richter, 131 S.Ct. 770, 786 (2011).  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  Id.  Thus, "even a strong case for relief  does not mean the state court's contrary conclusion was unreasonable."  Id.

### B.  No Motion to Suppress; Consent and Coercion

Petitioner argued in his pro se supplemental appeal brief that counsel was ineffective because he did not adequately investigate and challenge (1) the legality of the consent to the search of the home and (2) Petitioner's claim that his statement was coerced.  Tr. 1018, 1028-32.  His application to the Supreme Court of Louisiana argued that counsel was ineffective because he did not challenge the search of the home or Petitioner's contention that his

statement to police was coerced by the psychological pressure of a desire to see his children. Tr. 1085-90.

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." Kimmelman v. Morrison, 106 S.Ct. 2574, 2583 (1986). See also Johnson v. Stephens, 522 Fed. Appx. 213 (5th Cir. 2013) and Shed v. Thompson, 2007 WL 2711022, *5 (W.D. La. 2007). This court has applied the same standard in settings where counsel is faulted for not filing a motion to suppress on grounds other than the Fourth Amendment. Hargrove v. Warden, 2010 WL 2545197, *4 (W.D. La. 2010).

The state court addressed on direct appeal the argument that counsel should have better investigated or subpoenaed witnesses regarding the claims of illegal search and coerced statement. The court held that the "record does not support defendant's argument." The claim that a visit with children was somehow used to coerce Petitioner into making a statement was explored at trial, and Detective Oster testified that Petitioner was not told that he was required to give a statement before being allowed to see his children. The testimony was corroborated by Petitioner's own words in his recorded statement. With respect to the consent to search, the record showed that the woman who gave consent shared the residence with Petitioner and was the person who actually paid the rent. Regardless of whose name was on which lease agreements, or who owned the property, the record showed that Ms.

Barnes possessed common authority to consent to entry of the home where she lived.  The appellate court found that, based on this record, Petitioner had not established any error by counsel so serious as to deprive him of a fair trial.  <u>State v. Thomas</u>, 981 So.2d at 857-58.

Petitioner continues to make the same arguments that he presented to the state court, but he has not explained why the state court was wrong in rejecting these <u>Strickland</u> claims.  There is no reason to believe that counsel would have succeeded in suppressing the statement or the fruits of the search had he filed the motions to suppress that Petitioner advocates.  The state courts explored the claims on their merits and found no supporting evidence.  Petitioner suggests that counsel could have subpoenaed witnesses to prove that he saw his children after he gave his statement, but Petitioner testified on that point at trial, and that fact would not change the rest of the evidence that would defeat the motion to suppress.  The state court's application of <u>Strickland</u> to deny these claims was not objectively unreasonable, so habeas relief is not permitted.

**B.  No Motion to Suppress; <u>Miranda</u> Issue**

Petitioner federal memorandum lists a contention that counsel also should have moved to suppress on grounds of a <u>Miranda</u> violation.  The claim is mentioned in the heading of a portion of the memorandum, but the brief does not contain any particular argument under the heading to flesh out the issue.  Doc. 1-2, pages 20-22.  More important, Petitioner did not exhaust his state court remedies with respect to such a claim.  There was no apparent impediment to Petitioner litigating the claim on appeal or post-conviction so, as with the

unexhausted claims discussed above, Petitioner cannot show cause and prejudice to overcome the procedural bar that now applies to this claim.[1]

### D. Impeachment of Sam Smith

A police officer wrote a report that he interviewed Sam Smith, who described hanging out at the Circle K with the victim and others, including a man he had never seen before that night. The report states: "Sam advised that this subject had a handgun stuck in his waistband. Sam stated he thinks it was a revolver because it had a wooden handle or grip. Sam stated it looked like a western type gun." When Sam testified at trial he did not specify the type of handgun, revolver or semi-automatic, that he claimed to have seen Petitioner carrying.

Petitioner points to a Crime Lab report that lists items including one bullet that was tested and found to be a 9 mm bullet that had been fired from the barrel of a weapon rifled with nine lands and grooves, left twist. Petitioner filed in this case a letter (Doc. 18, Exhibit 1) that he wrote to a representative of Hi-Point Firearms in September 2011, several years

---

[1] Assuming Petitioner could show exhaustion or cause and prejudice, the claim would likely fail on the merits. It would face an initial hurdle that ambiguous statements regarding a request for counsel do not require the cessation of questioning; a suspect must unambiguously request counsel. Davis v. U.S., 114 S.Ct. 2350, 2355 (1994). Petitioner asked if he could have an attorney with him at the interview. When the police said yes, he said, "I need to call one." Assuming that was an adequate invocation, it only prohibited further questioning until a lawyer was made available or the suspect himself reinitiated conversation. Edwards v. Arizona, 101 S.Ct. 1880 (1981). The transcript reflects that Petitioner decided that he did not want an attorney, and he stated that he made the decision voluntarily without the detectives doing anything to make him change his mind. Tr. 1648-50. A zealous defense counsel may have nonetheless filed a motion to suppress and attempted to establish a Miranda/Edwards violation, but Petitioner has not pointed to evidence in the record to show that the motion would be meritorious so that relief is permitted under the Kimmelman standard.

after his trial.  The letter has handwriting on it that purports to have been written by a Mr. Tom Deeb with Hi-Point in response to Petitioner's questions.  Deeb purportedly stated that Hi-Point is the only manufacturer in the world to use nine lands and grooves, left twist, in its weapons, and Hi-Point does not manufacture western type revolvers.  He identified the only models to use that particular land and groove setting, and they were not revolvers.

Petitioner argues that counsel was constitutionally deficient because he did not use this information to cross-examine Smith at trial.  Of course, counsel did not have the benefit of the 2011 letter from Mr. Deeb.  He would have had the police report that stated Sam said the gun had a wooden handle or grip, which made Sam Smith think it was a revolver. Assuming the victim was killed by a 9 mm round or rounds, and there was no testimony at trial on that point, the round could have been fired from a revolver.

Petitioner's argument apparently relies on the assumption that only semi-automatic pistols fire 9 mm projectiles, but there have long been a number of revolvers manufactured to fire a 9 mm round, usually with the aid of moon clips or a similar device.   Thus, Sam Smith may have seen Petitioner with a 9 mm revolver.  That fact undermines the ability of counsel to have impeached Smith with his prior statement.

Counsel was certainly not deficient because he did not possess the information of a Hi-Point representative, gained years after the trial, that suggested a round recovered in the investigation was fired from a Hi-Point semi-automatic weapon rather than a revolver.  The case did not hinge upon showing that Petitioner used the gun he displayed at the Circle K to commit the murder.  The weapon used in the crime was never recovered, and it was not an

important part of the prosecution.  Counsel could not, with the information he possessed at the time of trial, cross-examined Smith and made any point that would have been so significant that there is a reasonable likelihood it would have changed the result of the trial. There is, therefore, no merit to this claim.  The court has addressed the merits of the claim, but it appears that this is yet another claim on which Petitioner did not properly exhaust his state court remedies.

### E.  Conflict of Interest

Petitioner argued in his post-conviction application (Tr. 1198-1201) that there was a conflict between him and public defender Kurt Goins.  Petitioner described the conflict as based on Petitioner's desire to file a number of motions to quash, suppress, for speedy trial, and the like, and counsel's disagreement with those strategies.  Petitioner eventually filed a number of such motions pro se.  He argued that this placed him at "serious odds" with his attorney.  The trial court acknowledged the claim, set forth the <u>Strickland</u> standard, and concluded without specifically discussing this claim that Petitioner failed to provide any factual basis to support his contentions so did not meet the two-prong test of <u>Strickland</u>.  Tr. 1299-1301.  The state appellate court summarily concluded that Petitioner "failed to prove that defense counsel committed any unprofessional errors" so there was no reasonable probability that, but for an error, the result would have been different.  Tr. 1307.

Petitioner's argument to this court has changed with respect to the conflict argument. He now refers to an alleged disagreement over efforts to obtain an autopsy report.  The Caddo Parish coroner died prior to this trial, and it was discovered that he had not personally

been performing autopsies.  There were also suggestions of other improprieties in the office.

This is probably why the prosecution did not introduce an autopsy report or other forensic

evidence in this case.  During the pretrial proceedings, counsel had attempted to obtain some

of the autopsy related records.  Petitioner represents that counsel was stating at a hearing that

those requests had been satisfied and withdrawn.  Petitioner attempted to address the court,

and counsel told him to "shut up."  Petitioner says that he replied, "Who you telling to shut

up, MF?"  Counsel allegedly responded, "You shut the f*** up!"  Petitioner attaches a

purported letter from counsel that recounts this incident.

Petitioner did not properly exhaust his state court remedies with respect to this issue.

He cannot base his claim on one set of facts in the state court and then present a wholly

different set of facts in the federal court.  In any event, he has not demonstrated that there

was prejudice to the defense because of any disagreement between him and counsel.  See

Beets v. Scott, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) (Strickland standard is used to

assess conflict claims outside of multiple or serial client representation situations).  Petitioner

has not met his burden on this final claim.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus be

denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties

aggrieved by this recommendation have fourteen (14) days from service of this report and

recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 27th day of February, 2015.

Mark L. Hornsby
U.S. Magistrate Judge